UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| REALPAGE INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:19-CV-1350-B |
| | § | |
| NATIONAL UNION FIRE | § | |
| INSURANCE COMPANY OF | § | |
| PITTSBURGH, PA and BEAZLEY | § | |
| INSURANCE COMPANY, INC., | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant National Union Fire Insurance Company of Pittsburgh, Pennsylvania's Partial Motion to Dismiss (Doc. 14). For the reasons that follow, the Court **DENIES** the motion.

## I.

## BACKGROUND[1]

This is a commercial insurance coverage dispute. Plaintiff RealPage, Inc. "provides software and data analytics to the real estate industry," as well as "property management, resident services, and revenue management" to owners and managers of various properties. Doc. 1, Compl., ¶ 2. As part of these services, RealPage collects, manages, and transfers rent payments. *Id.*

In 2017, RealPage acquired a subsidiary that "provides payment processing services to a

---

[1] The Court draws the facts from Plaintiff RealPage Inc.'s complaint (Doc. 1). Any contested fact is identified as the contention of a particular party.

- 1 -

subset of [RealPage's] clients." *Id.* ¶ 4. Specifically, RealPage explains, its subsidiary collects rental payments from residents and transfers the payments to RealPage's client–properties. *Id.* ¶ 27. To accomplish the transfer, RealPage's subsidiary has a web portal, through which it receives residents' payments. *Id.* To thereafter direct these payments to its client–properties, RealPage's subsidiary utilizes "a third-party software application . . . ." *Id.* ¶ 28. This application sends "the payments to a bank clearing account, and then transfers those funds to the appropriate client's bank account" per the instructions that RealPage's subsidiary gives to the application. *Id.* The application also directs "[t]ransactional fees owed to RealPage" for its processing services. *Id.* RealPage characterizes the application as "a mere conduit," because "RealPage controls and directs all transfers of funds through the use of the . . . application[.]" *Id.*

In May of 2018, RealPage fell victim to a "targeted phishing scheme," in which the perpetrator "obtain[ed]" and "alter[ed] the account credentials of a RealPage employee." *Id.* ¶ 30. Using those credentials, the perpetrator "access[ed] the third-party software application to change certain bank account disbursement instructions provided by [RealPage's subsidiary.]" *Id.* Through this scheme, RealPage alleges, the perpetrator diverted over $10,000,000 in funds that RealPage had collected but not yet distributed to client–properties. *Id.* Ultimately, RealPage although recovered some funds, it lost more than $6,000,000. *Id.* ¶ 31.

Two months prior to this scheme, RealPage purchased a Commercial Crime Policy ("the Policy") from Defendant National Union Fire Insurance Company of Pittsburgh, Pennsylvania. *Id.* ¶ 16. The Policy, effective March 31, 2018, through March 31, 2019, contains multiple insuring agreements providing specific forms of coverage to RealPage. *Id.*; Doc. 1-1, Pl.'s App., 7–8 (Ex. A).

Three insuring agreements from the Policy are relevant here. The first insuring agreement,

titled "Computer Fraud," states that National Union will pay for loss or damage "resulting directly from the use of any computer to fraudulently cause a transfer" from within RealPage or its bank to a place outside of RealPage or its bank. *See* Doc. 1-1, Pl.'s App., 8, 18, 20 (Ex. A). The second insuring agreement, titled "Funds Transfer Fraud," requires National Union to pay for loss "resulting directly from a 'fraudulent instruction' directing a financial institution to transfer, pay or deliver 'funds' from" RealPage's accounts. *Id.* at 8. Finally, the Policy contains a third insuring agreement for "Employee Theft," which states that National Union must pay for loss or damage "resulting directly from 'theft' committed by an 'employee,' whether identified or not, acting alone or in collusion with other persons." *Id.* at 7. In this agreement, "theft" includes "forgery." *Id.* All three insuring agreements contain a $5,000,000 limit of insurance per occurrence and a $50,000 deductible. *Id.* at 4.[2]

Following the phishing scheme, RealPage provided notice to National Union of the fraud and submitted a formal proof of loss to National Union. Doc. 1, Compl., ¶¶ 33–34. In response, National Union denied coverage for most of RealPage's losses. *Id.* ¶ 37. According to RealPage, though National Union acknowledged that the phishing scheme "triggered coverage" under the Policy's Computer Fraud insuring agreement, National Union concluded that the Policy only covered RealPage's loss of transactional fees—not RealPage's loss of client funds. *Id.* ¶¶ 37–38.

As a result, RealPage brings the following causes of actions against National Union: (1) a Declaratory Judgment claim, asking the Court to declare RealPage's right to coverage under the

---

[2] RealPage also purchased an "Excess Fidelity and Crime Policy" from Defendant Beazley Insurance Company, Inc. Doc. 1, Compl., ¶¶ 25–26. Though coverage under this policy is also at issue in this case, it is not relevant to the Court's analysis of National Union's motion.

Policy for its losses resulting from the phishing scheme; (2) a breach-of-contract claim; (3) violations of the Texas Unfair Competition and Unfair Practices Act, TEX. INS. CODE § 541.001 *et seq.*; and (4) violations of the Texas Prompt Payment of Claims Act (PPCA), TEX. INS. CODE § 542.001, *et seq.* Doc. 1, Compl., ¶¶ 45–52; 61–67; 75–78; 79–82.

Now, National Union moves to dismiss RealPage's PPCA claims, contending that because the Policy at issue is a fidelity bond, RealPage cannot bring claims under the PPCA. Doc. 14-1, Def.'s Mem. in Supp. of Mot., 4; *see also* TEX. INS. CODE § 542.053 (stating that the PPCA does not apply to fidelity bonds). The Court has received all briefing on this motion. Accordingly, it is ripe for review.

## II.

## LEGAL STANDARD

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 12(b)(6) authorizes the court to dismiss a plaintiff's complaint for "failure to state a claim upon which relief can be granted." In considering a Rule 12(b)(6) motion to dismiss, "[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). The court will "not look beyond the face of the pleadings to determine whether relief should be granted based on the alleged facts." *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999).

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not

suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* When well-pleaded facts fail to achieve this plausibility standard, "the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (internal quotation marks and alterations omitted).

## III.

## ANALYSIS

*A.   Whether RealPage Has Stated a Claim Under the PPCA*

The sole issue before the Court is whether RealPage has stated a claim under the PPCA in light of the undisputed fact that the PPCA does not apply to fidelity bonds. *See* TEX. INS. CODE § 542.053. To resolve this issue, the Court must make two determinations: (1) the definition of a fidelity bond under the PPCA, and (2) whether RealPage's PPCA claims are based upon a fidelity bond.

  1. <u>The definition of a fidelity bond under the PPCA</u>

The Court first turns to the meaning of "fidelity bond" as used in the PPCA. The PPCA is to "be liberally construed to promote the prompt payment of insurance claims." *Id.* § 542.054. Under the PPCA provisions at issue in this case, an insurer must notify a claimant of the insurer's "acceptance or rejection of a claim" within fifteen days after receiving the documentation necessary

to demonstrate proof of loss and promptly pay upon a claim. *Id.* §§ 542.056, 542.058(a).[3] Though the PPCA applies broadly to "any insurer," *id.* § 542.052, the PPCA does not apply to "fidelity, surety, or guaranty bonds[.]" *Id.* § 542.053. The PPCA does not, however, define the term "fidelity bond." *See id.* § 542.051.

Accordingly, the Court must construe the term in accordance with its "common usage" or, if applicable, its technical meaning. *See* TEX. GOV'T CODE § 311.011; *id.* § 311.002 (applying Chapter 311 of the Texas Government Code to "each code enacted by the 60th or a subsequent legislature," as well as to "each amendment . . . of a code or code provision by the 60th or a subsequent legislature").

National Union contends that fidelity bonds are synonymous with commercial crime policies and thus "are not limited to losses caused by employee theft . . . ." Doc. 14-1, Def.'s Mem. in Supp. of Mot., 11 (citing *Cooper Indus., Ltd., v. Nat'l Union Fire Ins. Co.*, 876 F.3d 119, 125 (5th Cir. 2017)); Doc. 39-1, Def.'s Br. in Supp. of Reply, 4. RealPage, on the other hand, argues that fidelity bonds "respond[] to loss due to theft or other misconduct by the insured's employees or others holding a position of trust with the insured." Doc. 31, Pl.'s Resp., 1.

The Court agrees with RealPage. According to Black's Law Dictionary, a "fidelity bond" is "[a] bond to indemnify an employer or business for loss due to embezzlement, larceny, or gross negligence by an employee or other person holding a position of trust." *Fidelity bond*, BLACK'S LAW DICTIONARY (11th ed. 2019); *see also* 68 TEX. JUR., SURETYSHIP & GUARANTY § 231 (3d ed. 2020) (adopting this definition) (citing *Tex. Ass'n of Sch. Bds., Inc. v. Travelers Cas.*, 2016 WL 4257748

---

[3] Specifically, the insurer must pay within the period provided "by other applicable statutes or, if other statutes do not specify a period," within sixty days. *Id.* § 542.058(a).

(W.D. Tex. July 7, 2016)).

Indeed, a district court in the Western District of Texas adopted the same definition of fidelity bond in *Texas Association of School Boards* (*TASB*), a case relied upon by both RealPage and National Union. *See* 2016 WL 4257748, at *9. In *TASB*, the plaintiff–claimant discovered that one of its employees had stolen from one of the plaintiff–claimant's accounts. *Id.* at *1. Thereafter, the plaintiff–claimant submitted a claim to the defendant–insurer for the employee's theft based upon an insurance policy containing an insuring agreement for "Employee Theft." *Id.* at *1, *5. The insuring agreement provided that the insurer–defendant would pay for loss caused by the theft or forgery of an employee. *Id.* at *5. After the defendant–insurer partially denied coverage, the plaintiff–claimant brought suit against the defendant–insurer, alleging, among other claims, PPCA violations. *Id.* at *1, *9. Utilizing Black's Law Dictionary's definition of fidelity bond, the district court granted summary judgment in favor of the defendant–insurer on the PPCA claims, reasoning that the plaintiff–claimant's "employee theft policy is appropriately considered a fidelity bond and is thus exempt from the [PPCA.]" *Id.* at *9.

Here, National Union analogizes to *TASB*, contending that there, the district court "found that the crime policy at issue was a fidelity bond . . . ." *See* Doc. 14-1, Def.'s Mem. in Supp. of Mot., 11. But the reasoning of the district court's opinion in *TASB* is not so broad. First, the district court expressly adopted Black's Law Dictionary's definition of "fidelity bond," which cabins fidelity bonds to indemnifying loss incurred due to the conduct of "an employee or other person holding a position of trust." *TASB*, 2016 WL 4257748, at *9 (quoting *Fidelity bond*, BLACK'S LAW DICTIONARY (10th ed. 2014)). Then, applying this definition, the district court found that the specific "employee theft policy"—not the insurance policy as a whole—was a fidelity bond. *See id.* Thus, *TASB* does not

support National Union's characterization of a fidelity bond.

Likewise, the Court is not persuaded by the reasoning in *Cooper*—another case cited by National Union. *See* Doc. 14-1, Def.'s Mem. in Supp. of Mot., 11. While National Union relies upon *Cooper* for the proposition that "commercial crime policies are synonymous with fidelity bonds," *id.*, this Court's reading of *Cooper* is not so expansive. In *Cooper*, the Fifth Circuit stated that the plaintiff–claimant "bought annual commercial-crime policies (also known as fidelity bonds) . . . ." 876 F.3d at 125. Though this language, in isolation, suggests that the Fifth Circuit equates commercial crime policies with fidelity bonds, the court continued by stating that the relevant policy at issue "covered [the plaintiff–claimant's] employee-benefit plans . . . against various types of *employee misconduct*, including theft and fraud[.]" *Id.* (emphasis added). Thus, in *Cooper*, the Fifth Circuit had no occasion to examine whether policy provisions unrelated to employee misconduct are, under the PPCA, fidelity bonds. Consequently, the single sentence in *Cooper* likening commercial crime policies to fidelity bonds does not persuade the Court to depart from the plain meaning of "fidelity bond."

Accordingly, for purposes of resolving this motion and in the absence of countervailing authority, the Court holds that a fidelity bond is "[a] bond to indemnify an employer or business for loss due to embezzlement, larceny, or gross negligence by an employee or other person holding a position of trust." *Fidelity bond*, BLACK'S LAW DICTIONARY (11th ed. 2019). Applying this definition, the Court must now determine whether RealPage's PPCA claims are based upon a fidelity bond.

2. <u>Whether RealPage's PPCA claims are based on a fidelity bond</u>

RealPage's PPCA claims relate to coverage under two specific insuring agreements in the Policy: (1) Computer Fraud, and (2) Funds Transfer Fraud. *See* Doc. 1, Compl., ¶¶ 46, 80; *see also* Doc. 31, Pl.'s Resp., 7–8. The first insuring agreement, Computer Fraud, provides that National

Union will pay for loss or damage "resulting directly from the use of any computer to fraudulently cause a transfer" from within RealPage or its bank to a place outside of RealPage or its bank. *See* Doc. 1-1, Pl.'s App., 8, 18, 20 (Ex. A). The second agreement, Funds Transfer Fraud, requires National Union to pay for loss "resulting directly from a 'fraudulent instruction' directing a financial institution to transfer, pay or deliver 'funds' from" RealPage's accounts. *Id.* at 8.

In addition to these insuring agreements, the Policy contains an insuring agreement for Employee Theft, which states that National Union must pay for loss or damage "resulting directly from 'theft' committed by an 'employee,' whether identified or not, acting alone or in collusion with other persons." *Id.* at 7. In this provision, "theft" includes "forgery." *Id.* Further, on the "Declarations" portion of the policy, as well as on the first page of the Policy setting forth the insuring agreements, the Policy has a corner heading that states "CRIME AND FIDELITY." *Id.* at 4–7.

With this context in place, the Court turns to the law governing its interpretation of the insuring agreements in the Policy.

Texas law governs this diversity case. *See Cleere Drilling Co. v. Dominion Expl. & Prod., Inc.*, 351 F.3d 642, 646 (5th Cir. 2003). And under Texas law, insurance policies are controlled by the same rules of construction that apply to contracts. *See Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 740–41 (Tex. 1998).

Generally, courts "must determine the intention of the parties as expressed in the language of the policy." *Allied World Specialty Ins. Co. v. McCathern PLLC*, 2017 WL 3841610, at *2 (N.D. Tex. May 2, 2017) (citation omitted). "The parties' intention is to be determined by an inquiry limited to the four corners of the insurance policy and what is actually stated therein." *Id.* (citation omitted). Accordingly, extrinsic evidence is only admissible when a policy is ambiguous on its face.

*Nat'l Union Fire Ins. Co. v. CBI Indus.*, 907 S.W.2d 517, 520 (Tex. 1995). The policy should be considered as a whole, so as to give each part effect and avoid rendering any portion superfluous. *Balandran*, 972 S.W.2d at 741. Further, courts should generally "construe contractual provisions in a manner that is consistent with the labels the parties have given them." *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 121 (Tex. 2015). Nonetheless, courts must afford "greater weight . . . to the operative contractual clauses of the agreement" than to their titles. *Enter. Leasing Co. v. Barrios*, 156 S.W.3d 547, 549 (Tex. 2004) (citation and quotation marks omitted).

Applying these principles, the Court concludes that National Union has not established that the Computer Fraud and Funds Transfer Fraud insuring agreements are "bond[s] to indemnify [RealPage] for loss due to embezzlement, larceny, or gross negligence by an employee or other person holding a position of trust." *See Fidelity bond*, BLACK'S LAW DICTIONARY (11th ed. 2019).

As a preliminary matter, neither party argues that the language in the Computer Fraud and Funds Transfer Fraud insuring agreements is ambiguous. Accordingly, the Court confines its inquiry to the four corners of the Policy itself, not the parties' subsequent characterizations of the agreements or documents submitted for recovery under the Policy.[4]

Turning to the specific language of each insuring agreement, neither mentions insuring RealPage against the misconduct of an employee or an individual in a position of trust—a distinctive feature of fidelity bonds. *See* Doc. 1-1, Pl.'s App., 8 (Ex. A); *Fidelity bond*, BLACK'S LAW DICTIONARY

---

[4] Consequently, the Court need not determine whether RealPage's proof-of-loss form is "central" to its claims. *See* Doc. 31, Pl.'s Resp., 10–11; Doc. 39-1, Def.'s Br. in Supp. of Reply, 8 (disputing whether the Court can consider the proof of loss as a document referred to in RealPage's complaint and central to its claims). The Court's assumption of unambiguity, however, does not preclude the parties from, at the summary-judgment stage: (1) arguing that the Policy is ambiguous, or (2) asking the Court to consider extrinsic evidence in light of any ambiguity.

(11th ed. 2019). Further, within the Policy, there is another insuring agreement that specifically insures RealPage's losses suffered due to employee misconduct. *Id.* at 7. Reading the three insuring agreements harmoniously, then, it appears that the Employee Theft agreement functions as a fidelity bond, while the Computer Fraud and Funds Transfer Fraud agreements provide different protection: protection from losses related to fraudulent transfers by outsiders who are not colluding with employees. *See id.* at 7–8.

Moreover, the fact that the Policy itself contains a "CRIME & FIDELITY" heading, see *id.* at 4–7, does not alter the Court's analysis. Rather, the heading suggests that the Policy offers fidelity coverage, along with other, additional coverage. This fidelity-and-more notion is consistent with the Court's conclusion that the Policy appears to contain one insuring agreement that serves as a fidelity bond, along with other agreements that offer different coverage.

Further, regardless of the heading, this Court must place "greater weight" upon the "operative contractual clauses of the [Policy.]" *See Enter. Leasing Co.*, 156 S.W.3d at 549 (citation and quotation marks omitted). Here, the language of the Computer Fraud and Funds Transfer Fraud insuring agreements does not suggest that the parties intended these two agreements to "indemnify [RealPage] for loss due to embezzlement, larceny, or gross negligence by *an employee or other person holding a position of trust.*" *See Fidelity bond*, BLACK'S LAW DICTIONARY (11th ed. 2019) (emphasis added). Accordingly, RealPage has stated plausible PPCA claims, and the Court **DENIES** National Union's partial motion to dismiss.

## IV.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** National Union's partial motion to dismiss

(Doc. 14) RealPage's PPCA claims.

SO ORDERED.

SIGNED: April 1, 2020.

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE