UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

REALPAGE INC.,                          §
                                        §
    Plaintiff,                          §
                                        §
v.                                      §     CIVIL ACTION NO. 3:19-CV-1350-B
                                        §
NATIONAL UNION FIRE                     §
INSURANCE COMPANY OF                    §
PITTSBURGH, PA and BEAZLEY              §
INSURANCE COMPANY, INC.,                §
                                        §
    Defendants.                         §

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff RealPage, Inc. ("RealPage")'s Motion for Partial Summary Judgment (Doc. 75), Defendant National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("National Union")'s Motion for Summary Judgment (Doc. 80), and Defendant Beazley Insurance Company, Inc. ("Beazley")'s Motion for Summary Judgment (Doc. 72). These cross-motions require the Court to determine whether RealPage is entitled to coverage under commercial-crime insurance policies for the loss of its clients' funds, which were diverted through a phishing scheme. The central issue to the coverage determination is whether RealPage held these funds despite its use of a third-party payment processor, Stripe, Inc. ("Stripe").

Because the Court concludes that RealPage did not hold the stolen funds at issue, the Court **GRANTS** summary judgment in favor of National Union and Beazley on all claims against them. Accordingly, the Court **DENIES** RealPage's motion (Doc. 75) and **GRANTS** National Union's motion (Doc. 80) and Beazley's motion (Doc. 72). Further, because this Order disposes of all claims

asserted by RealPage, the Court **DENIES** National Union's pending motions to exclude expert testimony (Docs. 106 & 109) as **MOOT**.

# I.

# BACKGROUND[1]

A.    *Factual Background*

This is an insurance dispute regarding whether RealPage sustained a covered loss under commercial-crime policies issued by National Union and Beazley when it fell victim to a phishing scheme. The Court first provides background on RealPage's services. Then, it describes how Stripe, a third party, assisted with these services. Thereafter, the Court explains the phishing scheme giving rise to RealPage's claim for coverage, as well as the relevant provisions of the commercial-crime policies and National Union's denial of coverage at issue here.

1.    RealPage's Services

RealPage provides several services for property owners and managers in the real estate industry. Doc. 76, Pl.'s Mot., 5–6 (citations omitted). One such service is "the collection of rental and other payments from residents and the transfer of those payments to clients." *Id.* at 6 (citations omitted). To facilitate these transfers, RealPage's clients (the property-management companies) entered contracts with RealPage authorizing it to "act as an agent on [the] Client's behalf," "manage and collect monies debited from the Client's customers['] . . . accounts, and to credit [the] Client's identified bank account less any transaction fees[.]" Doc. 77-1, Pl.'s Mot. App., 219.[2] Through these

---

[1] The Court draws its factual account from the summary-judgment evidence and briefing.

[2] On-Site Manager, Inc., the named party in this contract, is a wholly owned subsidiary of RealPage. Doc. 76, Pl.'s Mot., 6.

contracts, RealPage's clients also authorize RealPage "to complete the merchant account application process with a third[-]party bank with which [RealPage] has a relationship on [the] Client's behalf." Doc. 77-1, Pl.'s Mot. App., 220. Finally, as part of the agreements, RealPage's clients warrant to RealPage that their tenants authorize the transactions processed by RealPage, and the clients provide RealPage with their own bank account information. *See id.*

2.   RealPage's Payment Processing Through Stripe

With respect to RealPage's payment-processing services relevant here, RealPage contracted with Stripe, a third party, for Stripe to provide "software services that enable payment processing and related functions[.]" *Id.* at 281. Pursuant to this arrangement, funds flowed as follows: A tenant would log in to an interface called "Resident Passport" to make a payment to one of RealPage's clients. *Id.* at 308–09. Resident Passport was a "RealPage website that was designed to look like a client website[.]" Doc. 98, Pl.'s Resp., 6; Doc. 99, Pl.'s Resp. App., 599–600. Upon initiation of a payment by a tenant, RealPage would send application programming interface (API) calls to Stripe's server in one of two ways—either through an interface between Stripe and RealPage called the "Stripe Dashboard," which was accessible only to RealPage employees, or through use of the On-Site application, an application developed by RealPage that utilized APIs from Stripe. Doc. 96, Def.'s Resp. App., 412; Doc. 77-1, Pl.'s Mot. App., 298–99, 308–10. The API calls sent from RealPage to Stripe provided information about the tenant's account, the client's destination account, and the amount due to the client. Doc. 96, Def.'s Resp. App., 412–13.

Upon receipt of an API call, for an automated clearing house (ACH) transaction, Stripe would direct Wells Fargo, its bank, to "process an ACH [transfer] that would pull money from the [tenant]'s bank account" and place these funds in Stripe's Wells Fargo bank account. Doc. 77-1, Pl.'s

Mot. App., 324; Doc. 74, Def.'s Mot. App., 180.[3] Thereafter, Stripe would direct Wells Fargo to complete another ACH transfer to pay these funds to the clients in accordance with RealPage's instructions. Doc. 77-1, Pl.'s Mot. App., 324–25; Doc. 74, Def.'s Mot. App., 180. Additionally, to process fees owed to RealPage from the tenant's payment, Stripe would conduct "a separate step" through Wells Fargo of transferring the fees owed to RealPage's "parent account[.]" Doc. 77-1, Pl.'s Mot. App., 325–26. Stripe followed RealPage's instructions as to where funds should land—without these instructions, Stripe "would not know where [the] funds are . . . meant to go." *Id.* at 577.

Stripe is the account holder of its account at Wells Fargo, a "collective merchant bank account" that contains the funds related to transactions of various merchants utilizing Stripe, such as RealPage. Doc. 101, Def.'s Sealed Resp. App., 402; Doc. 74, Def.'s Mot. App., 213. The funds pertaining to the various merchants are commingled within Stripe's account. Doc. 101, Def.'s Sealed Resp. App., 405–06. Stripe's account is for the benefit of (FBO) its users and merchants such as RealPage. *Id.* If there was a balance owed to a client of RealPage, the funds for that balance in Stripe's account "would be for the benefit of that property management company[.]" *Id.* at 404. Pursuant to one of RealPage's contracts with Stripe, RealPage had "no rights to [Stripe's account] or to any funds held in the [account]," RealPage was "not entitled to draw funds" from the account, and RealPage did "not receive interest from funds maintained in" the account. Doc. 82, Def.'s Mot. App., 219.

Though a Stripe representative characterizes its role as that of an "agent," Doc. 99, Pl.'s Resp. App., 623, RealPage's contracts with Stripe disclaim an agency relationship and state that Stripe

---

[3] If a tenant pays by credit card, the client's funds "first land" in another Wells Fargo account before transfer into Stripe's Wells Fargo account. Doc. 74, Def.'s Mot. App., 213.

serves as an independent contractor. Doc. 77-1, Pl.'s Mot. App., 273 ("Except as expressly stated in this Agreement, nothing in this Agreement serves to establish [an] . . . agency relationship between you and us . . . . Each party to this Agreement . . . is an independent contractor."), 282 ("You and Stripe are independent entities, and this [agreement] does not create any partnership, agency, or employment relationship between you and Stripe[.]"). One of the contracts recognizes an exception to this disclaimer by stating that Stripe is RealPage's agent for holding the funds that are ultimately owed to RealPage. *Id.* at 260–61 (stating that RealPage appoints Stripe as its agent "for the limited purpose of . . . holding . . . proceeds" that are "*owed to*" Realpage (emphasis added)).

### 3.   The Phishing Scheme

In May 2018, bad actors "used a targeted phishing scheme to obtain and to alter the account credentials of a RealPage employee." Doc. 76, Pl.'s Mot., 8 (citations omitted). They then used those credentials to access the Stripe Dashboard and alter RealPage's fund-disbursement instructions to Stripe. *Id.* (citations omitted). Through this scheme, the bad actors diverted over $10,000,000 that had not yet been disbursed to RealPage's clients. *Id.* at 8–9 (citations omitted). Upon discovering the fraud, RealPage contacted Stripe and directed it to reverse the payments and freeze any ongoing transfers. *Id.* at 9 (citations omitted). While RealPage ultimately recovered a portion of the lost funds, it was unable to recover more than $6,000,000. *Id.* (citations omitted). RealPage reimbursed its clients for the lost funds. Doc. 74, Def.'s Mot. App., 49.

### 4.   RealPage's Insurance Policies With National Union and Beazley

Prior to the phishing scheme, RealPage obtained a "Commercial Crime Policy" ("the Policy") from National Union. *See* Doc. 77, Pl.'s Mot. App., 18. The Policy, effective March 31, 2018, through March 31, 2019, provides $5,000,000 in coverage (subject to a $50,000 deductible) for

specified losses. *See id.* at 18–19. RealPage also obtained an "Excess Fidelity and Crime Policy" ("the

Excess Policy") from Beazley for the same policy period. *See id.* at 79. The Excess Policy provides a

$5,000,000 limit of liability "for any loss which triggers coverage under the [Policy.]" *Id.* at 79, 86.

The parties thus agree that whether RealPage is entitled to coverage under the Excess Policy depends

on whether RealPage is entitled to coverage under the Policy. *See* Doc. 76, Pl.'s Mot., 5; Doc. 73,

Def.'s Mot., 8.

The Policy contains several provisions relevant here. First and foremost, the Policy has a

provision titled "Ownership of Property; Interests Covered" that reads:

> The property covered under this policy is limited to property:
>
> (1)     That you own or lease; or
> (2)     That you hold for others whether or not you are legally liable for the
>           loss of such property.
>
> However, this policy is for your benefit only. It provides no rights or benefits to any
> other person or organization. Any claim for loss that is covered under this policy must
> be presented by you.

Doc. 77, Pl.'s Mot. App., 28.

Next, the Policy has two insuring agreements at issue. One is a "Computer Fraud" insuring

agreement, which states:

> We will pay for loss of or damage to "money", "securities" and "other property"
> resulting directly from the use of any computer to fraudulently cause a transfer of that
> property from inside the "premises" or "banking premises":
>
> a.     To a person (other than a "messenger") outside those "premises"; or
> b.     To a place outside those "premises".

*Id.* at 22. The other relevant insuring agreement, titled "Funds Transfer Fraud," states:

> We will pay for loss of "funds" resulting directly from a "fraudulent instruction"
> directing a financial institution to transfer, pay or deliver "funds" from your "transfer

account".

*Id.*

Finally, the Policy contains an exclusion stating that the Policy does not cover:

Loss that is an indirect result of an "occurrence" covered by this policy including, but not limited to, loss resulting from:

(1)   Your inability to realize income that you would have realized had there been no loss of or damage to "money", "securities" or "other property".

(2)   Payment of damages of any type for which you are legally liable. But, we will pay compensatory damages arising directly from a loss covered under this policy.

(3)   Payment of costs, fees or other expenses you incur in establishing either the existence or the amount of loss under this policy.

*Id.* at 23.

Following the phishing scheme, RealPage filed a proof of loss with National Union, seeking coverage under the Policy for $6,022,021. *Id.* at 160–61. In response, National Union concluded that under the Computer Fraud insuring agreement, RealPage was entitled to coverage for the portion of the loss of funds that represented transactional fees owed to RealPage "since it owned those funds." *Id.* at 172. With respect to diverted funds that were owed to RealPage's clients, however, National Union concluded, based on a "preliminary analysis," that RealPage "did not own or hold the" funds and thus was not entitled to coverage. *See id.* After further communications between National Union and RealPage, *see, e.g.*, Doc. 77-1, Pl.'s Mot. App., 566, National Union confirmed its denial of coverage for the client funds. *Id.* at 188.

B.     *Procedural Background*

Following National Union's denial of coverage, RealPage filed an action in this Court. *See generally* Doc. 1, Compl. RealPage asserts the following causes of action against National Union: (1) a

- 7 -

declaratory-judgment claim, asking the Court to declare RealPage's right to coverage under the Policy for its loss of the client funds resulting from the phishing scheme; (2) a breach-of-contract claim; (3) violations of the Texas Unfair Competition and Unfair Practices Act, TEX. INS. CODE § 541.001 *et seq.*; and (4) violations of the Texas Prompt Payment of Claims Act (PPCA), TEX. INS. CODE § 542.001, *et seq.* Doc. 1, Compl., ¶¶ 45–52; 61–67; 75–78; 79–82. National Union moved to dismiss RealPage's PPCA claims on the ground that the Policy is a fidelity bond. *See* Doc. 14-1, Def.'s Mot., 4; *see also* TEX. INS. CODE § 542.053 (stating that the PPCA does not apply to fidelity bonds). The Court denied the motion to dismiss. Doc. 42, Mem. Op. & Order, 1.

In addition to claims against National Union, RealPage maintains two claims against Beazley: (1) a declaratory-judgment claim, asking the Court to declare RealPage's right to coverage under the Excess Policy; and (2) an anticipatory breach-of-contract claim, alleging that Beazley will, like National Union, deny RealPage's claim for coverage. Doc. 1, Compl., ¶¶ 53–60; 68–74.

On November 13, 2020, all parties filed motions for summary judgment. RealPage seeks partial summary judgment on the declaratory-judgment, breach-of-contract, and anticipatory breach-of-contract claims. *See* Doc. 75, Pl.'s Mot., 1. Meanwhile, National Union and Beazley moved for summary judgment on all claims against them. *See* Doc. 80, Def.'s Mot., 1; Doc. 72, Def.'s Mot., 1.[4] The Court has received all briefing on the three pending motions for summary judgment. Accordingly, they are ripe for review.

---

[4] While the summary-judgment motions were pending, National Union also moved to exclude the testimony of two of RealPage's designated experts, and Beazley joined one of these motions. *See generally* Doc. 106, Mot. to Exclude; Doc. 109, Mot. to Exclude; Doc. 111, Def. Beazley's Joinder.

## II.

## LEGAL STANDARDS

A.     *Summary Judgment*

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The substantive law governing a matter determines which facts are material to a case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The summary-judgment movant bears the burden of proving that no genuine issue of material fact exists. *Latimer v. Smithkline & French Lab'ys*, 919 F.2d 301, 303 (5th Cir. 1990). Usually, this requires the movant to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotation marks omitted).

Once the summary-judgment movant has met this burden, the burden shifts to the non-movant to "go beyond the pleadings and designate specific facts" showing that a genuine issue exists. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (per curiam) (citing *Celotex*, 477 U.S. at 325). "This burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Id.* (citations omitted). Instead, the non-moving party must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis in original) (quotation marks omitted).

"[C]ourts are required to view the facts and draw reasonable inferences in the light most

favorable to the party opposing the summary[-]judgment motion." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations incorporated) (quotations marks omitted). But the Court need not "sift through the record in search of evidence to support a party's opposition to summary judgment." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citation and quotation marks omitted). If the non-movant is unable to make the required showing, the Court must grant summary judgment. *Little*, 37 F.3d at 1076.

B.    *Interpretation of Insurance Policies Under Texas Law*

Texas law governs this diversity case. *See Cleere Drilling Co. v. Dominion Expl. & Prod., Inc.*, 351 F.3d 642, 646 (5th Cir. 2003) (citation omitted). And under Texas law, insurance policies are controlled by the same rules of construction that apply to contracts. *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 740–41 (Tex. 1998) (citations omitted).

Generally, courts "must determine the intention of the parties as expressed in the language of the policy." *Allied World Specialty Ins. Co. v. McCathern PLLC*, 2017 WL 3841610, at *2 (N.D. Tex. May 2, 2017) (citation omitted). "The parties' intention is to be determined by an inquiry limited to the four corners of the insurance policy and what is actually stated therein." *Id.* (citation omitted). The policy should be considered as a whole, so as to give each part effect and avoid rendering any portion superfluous. *Balandran*, 972 S.W.2d at 741 (citation omitted).

In determining the parties' intention, courts use the "ordinary and generally accepted meaning" of the words in a policy "unless the parties intended to 'impart a technical or different meaning.'" *Cooper Indus., Ltd. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 876 F.3d 119, 128 (5th Cir. 2017) (quoting *In re Deepwater Horizon*, 470 S.W.3d 452, 464 (Tex. 2015)). "To determine the ordinary meaning of a term not defined in the contract, courts typically begin with the dictionary

definition." *Id.* (citing *Epps v. Fowler*, 351 S.W.3d 862, 866 (Tex. 2011)). Thereafter, they may "consider the term's usage in other authorities[.]" *Id.* (citing *Evanston Ins. Co. v. Legacy of Life, Inc.*, 370 S.W.3d 377, 382–84 (Tex. 2012)). If the policy language is ambiguous, meaning it is "subject to two or more reasonable interpretations," *Nat'l Union Fire Ins. Co. v. CBI Indus.*, 907 S.W.2d 517, 520 (Tex. 1995) (citations omitted), the court "must adopt the interpretation favoring the insured." *Cooper*, 876 F.3d at 128 (citation omitted).

Finally, under Texas law, the insured has "the burden of establishing coverage," while the insurer has "the burden of establishing an exclusion[.]" *Wells v. Minn. Life Ins. Co.*, 885 F.3d 885, 890 (5th Cir. 2018) (citation omitted).

## III.

## ANALYSIS

A.    *The Court Grants Summary Judgment in Favor of National Union and Beazley on RealPage's Declaratory-Judgment and Breach-of-Contract Claims.*

The crux of this dispute is whether RealPage is entitled to coverage for the loss of the client funds under the Policy. The answer to this question dictates whether RealPage's declaratory-judgment, breach-of-contract, and anticipatory breach-of-contract claims prevail. *See* Doc. 1, Compl., ¶¶ 45–60 (seeking a declaratory judgment that National Union and Beazley must cover RealPage's losses in connection with the phishing scheme); ¶¶ 61–67 (alleging National Union breached the Policy by denying coverage for RealPage's losses); ¶¶ 68–74 (alleging Beazley will breach the Excess Policy, which "follows form" to the Policy, by denying excess coverage).

The Court first examines whether RealPage suffered a loss of property covered by the Policy

by determining whether RealPage held the client funds.[5] The Court concludes RealPage did not hold the funds. Due to this holding, the Court also finds that RealPage did not suffer a direct loss as required under the Policy.

    1.    <u>The client funds are not covered property under the Policy because RealPage did not hold the funds at the time of the phishing scheme.</u>

        *a.*    *The plain meaning of "hold," as used in the Policy, requires possession of the property.*

The plain meaning of the term "hold," as used in the Policy, connotes possession. RealPage argues that "the term 'hold' means to control, direct . . . , and keep under an obligation." Doc. 76, Pl.'s Mot., 15. But RealPage's definition omits a key characteristic of "hold" as that term is commonly understood—possession. *See Cooper*, 876 F.3d at 130 (applying "the common understanding of" an "everyday word" when interpreting an insurance policy).

There are numerous dictionary definitions of "hold" with one unifying characteristic: possession. Indeed, Black's Law Dictionary, Merriam-Webster's Dictionary, and the Oxford English Dictionary all refer to possession in defining "hold." *See Hold*, BLACK'S LAW DICTIONARY (11th ed. 2019) (including definitions such as "[t]o possess by a lawful title" and "[t]o possess or occupy"); *Hold*, MERRIAM-WEBSTER'S DICTIONARY (online ed.) (first defining hold as "to have possession"); *Hold*, OXFORD ENGLISH DICTIONARY (online ed.) (including definitions such as "[t]o have or keep as one's own absolutely or temporarily" and "to be in possession or enjoyment of"). Based on these definitions, the common meaning of "hold" includes possession—an ability to direct property, without more, is insufficient.

---

[5] The parties agree that RealPage did not own or lease these funds. *See* Doc. 77, Pl.'s Mot. App., 28.

RealPage cites to several dictionaries in support of its broad definition of "hold," but the contextual examples provided by the dictionaries demonstrate that RealPage's reliance is misplaced. For example, RealPage points out that in Black's Law Dictionary, one definition of "hold" is "[t]o direct and bring about officially[.]" Doc. 76, Pl.'s Mot., 14 (emphasis omitted). But the definition cited by RealPage, in full, states, "To direct and bring about officially; to conduct according to law <we must hold an election every two years>." *See Hold*, BLACK'S LAW DICTIONARY (11th ed. 2019). This definition does not refer to holding property. RealPage also relies upon Black's Law Dictionary's definition of "hold" that includes "keep[ing] in custody or under an obligation[.]" Doc. 76, Pl.'s Mot., 14 (emphasis omitted). But that definition's example sentence reads: "<I will ask the judge to hold you accountable>." *See Hold*, BLACK'S LAW DICTIONARY (11th ed. 2019). Again, this definition does not appear to refer to holding property—and even if it did, RealPage did not "keep" the funds at issue. Finally, although Cambridge Dictionary's definitions of "hold" include "to have something, especially a position or money, or to control something[,]" the examples pertaining to this definition suggest "control" is applicable in the context of occupying land.[6] Thus, RealPage's proffered definitions are out of context.[7]

Beyond dictionary definitions, RealPage offers several other arguments in support of a more lenient definition of "hold for others." The Court addresses each argument in turn below.

---

[6] The examples following the definition state, "He currently holds the position of technical manager. The bank holds large reserves of gold. *Despite incurring heavy losses, the rebels now hold the town and the surrounding hills.*" *Hold*, CAMBRIDGE DICTIONARY (online ed.) (emphasis added). The first example demonstrates having a position, the second demonstrates having money, and the third demonstrates control.

[7] RealPage also suggests that having the funds "at one's disposal" constitutes holding the funds for others. *See* Doc. 105, Pl.'s Reply, 4–5. But the Court need not rule on this argument, because RealPage did not have the funds at its disposal. To the contrary, RealPage lacked rights over the funds and was not permitted to withdraw the funds from Stripe's account. Doc. 82, Def.'s Mot. App., 219.

First, the Court agrees with RealPage that the Policy intends for "own" and "hold" to have different meanings since those terms are listed separately. *See* Doc. 76, Pl.'s Mot., 14; Doc. 105, Pl.'s Reply, 4. But under the Court's interpretation, "own" and "hold" remain distinct—"own" encompasses a situation in which the insured "rightfully" possesses property, such as by "legal title"; with ownership, the property belongs to the insured. *See Own*, BLACK'S LAW DICTIONARY (11th ed. 2019); *Own*, OXFORD ENGLISH DICTIONARY (online ed.). "Hold," on the other hand, captures the situation in which the insured cannot claim that the property belongs to it—rather, the insured possesses the property owned by another. This distinction is reinforced by the fact that the Policy covers property "h[e]ld for others": the property is owned by, and belongs to, "others." Doc. 77, Pl.'s Mot. App., 28. Thus, contrary to RealPage's argument, reading possession into the definition of "hold" does not render "'own' or 'hold' meaningless." Doc. 105, Pl.'s Reply, 4.

RealPage next argues that the expansive scope of the covered-property section, which refers to property held by RealPage "whether or not [RealPage is] legally liable for the loss of such property," suggests that RealPage held the funds. *See* Doc. 76, Pl.'s Mot., 15 (emphasis omitted). The Court disagrees.

Although this language suggests that RealPage enjoys broad coverage under the Policy, it does not negate the requirement that RealPage "hold" the property at issue. Indeed, when analyzing the term "own" in a "Covered Property" provision identical to RealPage's, the Fifth Circuit relied upon the "common understanding of 'ownership'"—not the insured's proffered "equitable ownership" definition—despite the expansive scope of the covered-property clause. *See Cooper*, 876 F.3d at 125,

129–30.[8]

Additionally, RealPage points out that the Policy excludes "[l]oss resulting from . . . [t]he unauthorized use or disclosure of confidential information of another person or entity which is held by [RealPage.]" Doc. 77, Pl.'s Mot. App., 23. RealPage posits "it would be far-fetched to maintain that information controlled by RealPage but hosted by a third-party service provider on a different company's servers nevertheless is not 'held' by RealPage." Doc. 76, Pl.'s Mot., 16. But this exclusion prohibits coverage for the very situation RealPage describes, so the Court sees little significance in the exclusion's language for purposes of interpreting the phrase "hold for others."

Finally, RealPage relies upon a modification of the confidential-information exclusion noted above. The modification clarifies that the exclusion "does not apply to loss of any money . . . held by [RealPage] in any capacity . . . that was the subject of a [loss] resulting directly from the unauthorized use or disclosure of such information." Doc. 77, Pl.'s Mot. App., 61. According to RealPage, the inclusion of "in any capacity" suggests that the term "hold" should be "interpreted broadly" throughout the Policy. Doc. 76, Pl.'s Mot., 17. But the fact that the Policy mentions property "held . . . in any capacity," in one provision of the Policy, Doc. 77, Pl.'s Mot. App., 61, but not in the covered-property provision referring to property held for others, suggests that the parties did not intend such a broad reading in the latter. Further, the provision referenced by RealPage is language clarifying the scope of an exclusion—not a provision granting coverage. Thus, the Court affords this argument little weight.

In sum, the definition of "hold," as used in the Policy, cannot be reduced to an ability to

---

[8] The Fifth Circuit did not, however, determine the meaning of property the insured "hold[s] for others . . . ." *See id.* at 125.

direct—it requires some sort of possession of property.

Further, given that "hold" is readily definable here, the term is unambiguous. As discussed above, dictionaries define "hold" in a variety of ways. But "[t]o allow the existence of more than one dictionary definition to be the *sine qua non* of ambiguity would eliminate contextual analysis of contractual terms; any time a definition appeared in a dictionary . . . , that definition could be said to be 'reasonable' and thus render many, if not most, words ambiguous." *Gulf Metals Indus., Inc. v. Chi. Ins. Co.*, 993 S.W.2d 800, 806 (Tex. App.—Austin 1999, pet. denied). Nor does the parties' disagreement about the scope of "hold" give rise to ambiguity. *Lynch Props., Inc. v. Potomac Ins. Co. of Ill.*, 962 F. Supp. 956, 963 (N.D. Tex. 1996) (*Lynch I*) ("Although [the insured] disputes [the insurer's] narrower interpretation of the term[] 'hold' . . . , the disagreement alone cannot create ambiguity." (citation omitted)), *aff'd*, 140 F.3d 622 (5th Cir. 1998) (*Lynch II*). Further, there is no latent ambiguity here: "A latent ambiguity arises when a contract which is unambiguous on its face is applied to the subject matter with which it deals and an ambiguity appears by reason of some collateral matter." *CBI Indus.*, 907 S.W.2d at 520 (citations omitted). As further explained below, there is no ambiguity when the Court applies the covered-property section of the Policy to the facts of this case. Thus, in light of the plain meaning of "hold," the Policy is unambiguous.

> b.    *Applying the plain meaning of "hold," RealPage did not hold the client funds.*

RealPage's authority to direct the transfer of the funds does not amount to holding the funds. The funds, until diverted to the bad actors' accounts, remained in an account at Wells Fargo Bank in Stripe's name—not RealPage's. Doc. 96, Def.'s Resp. App., 413; Doc. 79-2, Def.'s Sealed Mot. App., 388. RealPage had no rights to the funds in the account and could not withdraw these funds. Doc. 82, Def.'s Mot. App., 219. Further, the funds were commingled with those of other Stripe users.

Doc. 101, Def.'s Sealed Reply App., 402, 405–06. Under these circumstances, RealPage did not possess the funds in any manner; thus, RealPage did not hold the funds.

*Lynch II*, though distinguishable from the case at hand, is helpful on this point. *See* 140 F.3d 622. In *Lynch II*, the Fifth Circuit considered whether the insured, Lynch Properties, "held" funds misappropriated by its employee. *Id.* at 626. The funds were in an account under the name of the owner of the funds, Mrs. Lynch. *Id.* at 625. Mrs. Lynch, however, paid Lynch Properties, pursuant to an oral agreement, to manage her property and "perform bookkeeping services for her personal bank accounts." *Id.* In connection with these services, Lynch Properties' employee, Bartlett, prepared a weekly check drawn on the personal accounts for Mrs. Lynch's spending money. *Id.* Only three individuals could sign the checks: Mrs. Lynch herself; Harry Lynch, who was both Mrs. Lynch's son and the president of Lynch Properties; and Bill Lynch, Mrs. Lynch's other son. *Id.* "By periodically drawing up an extra . . . check," having Harry Lynch sign it, "cashing the check[,] and pocketing the cash, Bartlett misappropriated $19,000 from Mrs. Lynch's personal bank accounts." *Id.*

In arguing that it "held" the misappropriated funds, Lynch Properties pointed out that it held the checks, and these checks were used to withdraw the stolen funds at issue. *Id.* at 625, 628. But the Fifth Circuit rejected this argument, explaining that Lynch Properties "fails to explain why the loss of the checks should be equated with the loss of the funds . . . ." *Id.* at 628. Emphasizing the "tenuousness of the connection between Lynch Properties" and the misappropriated funds, the Fifth Circuit held that Lynch Properties' possession of the checks did not amount to its holding of the funds. *Id.*; *see also Tex. Ass'n of Sch. Bds., Inc. v. Travelers Cas.*, 2016 WL 4257748, at *7 (W.D. Tex. July 7, 2016) (concluding insured did not hold funds when they were stolen where the insured had check-writing authority on an account containing the funds but did not have possession of the

account).

Likewise, here, RealPage's ability to direct the funds does not amount to holding the funds. The Court acknowledges that the connection between Lynch Properties and the stolen funds may be more tenuous than the connection between RealPage and its clients' funds. *See* Doc. 105, Pl.'s Reply, 9. Nevertheless, the Fifth Circuit's reasoning in *Lynch II* suggests that RealPage did not hold its clients' funds.

Namely, just as Lynch Properties relied upon its possession of checks, RealPage emphasizes its possession of credentials that were used to divert the funds at issue. But RealPage provides no basis for equating the holding of these credentials with the holding of the client funds, just as Lynch Properties provided no basis for equating the holding of checks with the holding of funds. Further, although RealPage had a written contract with its clients, this contract does not contemplate the use of Stripe—rather, it mentions only RealPage's ability to utilize "a third-party bank[.]" *See* Doc. 77-1, Pl.'s Mot. App. 219–20. Thus, though RealPage might have a closer connection to the funds at issue than that discussed in *Lynch II*, the Fifth Circuit's reasoning remains relevant: like Lynch Properties, RealPage argues it "constructively 'hold[s]' property," by way of its connection to the property, "that it otherwise would not 'hold.'" *See* 140 F.3d at 628. Accordingly, *Lynch II* supports the Court's conclusion that RealPage, despite its ability to direct the client funds, did not hold the funds.

RealPage offers another theory to suggest that it held the client funds. It contends that in *Lynch II*, the Fifth Circuit recognized that a bailee "holds" funds and that here, RealPage served as a bailee. Doc. 76, Pl.'s Mot., 17. The Court addresses both arguments below.

As a preliminary matter, in *Lynch II*, the Fifth Circuit did not expressly hold that an insured "holds" funds where it serves as a bailee of the funds. Rather, it addressed the insured's argument

that it held funds by way of a bailment. *See Lynch II*, 140 F.3d at 627 ("Lynch Properties' citation to cases mentioning bailment suggests that it believes that a bailment arrangement is one way in which it might have 'held' Mrs. Lynch's misappropriated funds.") But because there was no bailment, the Fifth Circuit never clarified whether a party serving as a bailee over property "holds" that property. *See id.* Instead, it concluded that because there was no bailment, and the insured "fail[ed] to suggest any other way it may have 'held' either the cash or the funds in the account," the insured "did not 'hold' the cash[.]" *Id.* at 627 n.2, 628. Nonetheless, by analyzing the existence of a bailment, the Fifth Circuit suggested that a bailee can "hold" property.

RealPage, however, has not shown the existence of a bailment under Texas law. A bailment requires:

> (1) delivery of personal property from one person, the bailor, to another, the bailee, for a specific purpose; (2) acceptance of delivery by the bailee; (3) an express or implied contract between the parties that the specific purpose will be realized; and (4) an agreement between the parties that the property will be either returned to the bailor or dealt with according to the bailor's direction.

*Texas v. $281,420.00 in U.S. Currency*, 312 S.W.3d 547, 551 (Tex. 2010).

Here, RealPage suggests that its "arrangement with its clients and the residents was a two-way bailment." Doc. 76, Pl.'s Mot., 18. Though RealPage does not define "two-way" bailment, it explains that its clients authorized it "to take 'possession' and 'control' of [the] funds . . . ." *Id.* But RealPage does not explain how its clients delivered the funds to RealPage; indeed, RealPage cannot do so, because it did not accept funds from its clients—it ensured the clients received the funds from tenants. *Cf. Cedar Lake Homeowners Ass'n v. Nw. Empire Cmty. Mgmt.*, 2015 WL 9690846, at *4 (D. Or. Nov. 13, 2015) (finding, under Oregon law, delivery element of bailment satisfied where the party sustaining a loss "delivered [the] funds to [the insured] by placing them in accounts on which

[the insured] was a custodian and by directing [the insured] to collect" and deposit fees into these accounts), *R. & R. adopted*, 2016 WL 126738 (D. Or. Jan. 11, 2016).

Moreover, even assuming the client's tenants delivered these funds by authorizing payments to the clients, the funds were not delivered to RealPage—they were delivered to Stripe's bank account, which contained the funds of various other Stripe users.

Though RealPage suggests that Stripe served as its agent, RealPage has not demonstrated an agency relationship under Texas law. *See* Doc. 76, Pl.'s Mot., 18; *see also* Doc. 99, Pl.'s Resp. App., 623 (Stripe representative characterizing Stripe as "acting as agent" for RealPage). First and foremost, RealPage's contracts with Stripe disclaim an agency relationship and state that Stripe serves as an independent contractor.[9] The Court recognizes that a disclaimer of an agency relationship does not preclude the existence of such a relationship under Texas law; "[i]t is the facts and circumstances of the case, not just the words of the parties' agreement, that establishes an agency relationship." *In re Carolin Paxson Advert., Inc.*, 938 F.2d 595, 598 (5th Cir. 1991) (citation omitted) (applying Texas law); *see also, e.g.*, *Mahan Volkswagen, Inc. v. Hall*, 648 S.W.2d 324, 329 (Tex. App. 1982—Houston [1st Dist.], writ ref'd n.r.e.). Nevertheless, a written agreement expressly providing "for an independent contractor relationship is determinative of the parties' relationship" absent "evidence indicating that the contract was subterfuge, that the hiring party exercised control in a manner inconsistent with the contract provisions, or if the written contract has been modified

---

[9] *Compare* Doc. 77-1, Pl.'s Mot. App., 273 ("Except as expressly stated in this Agreement, nothing in this Agreement serves to establish [an] . . . agency relationship between you and us . . . . Each party to this Agreement . . . is an independent contractor."), *and id.* at 282 ("You and Stripe are independent entities, and this [agreement] does not create any partnership, agency, or employment relationship between you and Stripe[.]"), *with id.* at 260–61 (stating that RealPage appoints Stripe as its agent "for the limited purpose of . . . holding . . . proceeds" that are "*owed to*" RealPage (emphasis added)).

by a subsequent agreement[.]" *Northwinds Abatement, Inc. v. Emps. Ins. of Wausau*, 258 F.3d 345, 351

(5th Cir. 2001) (citation omitted); *see also Poynor v. BMW of N. Am., LLC*, 441 S.W.3d 315, 319–20

(Tex. App.—Dallas 2013, no pet.) (citations omitted). Here, RealPage has not provided any

evidence suggesting that it exercised control over Stripe beyond that contemplated by their

contracts. *See Northwinds*, 258 F.3d at 351.

And even putting aside the parties' contractual characterizations, an agency relationship

exists only where the principal has "the right to control both the means and the details of the process

by which the alleged agent is to accomplish [its] task." *In re Carolin*, 938 F.2d at 598 (citations

omitted); *see also Del Carmen Flores v. Summit Hotel Grp.*, 492 F. Supp. 2d 640, 644 (W.D. Tex. Sept.

19, 2006) (explaining that, under Texas law, "a party is not an agent simply because he acts on

behalf of another" (citations omitted)). Though RealPage instructs Stripe regarding where and when

to move funds, *see* Doc. 99, Pl.'s Resp. App., 623; Doc. 77-1, Pl.'s Mot. App., 577–78, RealPage has

not presented any evidence that it has the right to control how Stripe accomplishes its

payment-processing services. Put differently, Stripe's task is processing payments owed to RealPage

and its clients, but RealPage lacks control over the method by which Stripe accomplishes this task.

As a result, RealPage has not presented evidence for the Court to infer that Stripe served as

RealPage's agent under Texas law.

Additionally, even assuming Stripe was RealPage's agent under Texas law, RealPage's

bailment argument depends upon two different parties serving as bailor: RealPage contends its clients

entered into a bailment agreement with RealPage, while its clients' residents delivered the property

subject to the bailment. *See* Doc. 77-1, Pl.'s Mot. App., 319–20 (confirming that RealPage did not

enter an agreement with the clients' residents). RealPage, which bears the burden of establishing

coverage, has not provided any authority suggesting this is a proper bailment under Texas law.

RealPage also argues that parties may "specify bailment circumstances" by contract and that RealPage has done so with its clients here. Doc. 105, Pl.'s Reply, 6.  As an initial matter, the authority RealPage cites for this proposition refers to contracts regarding "the obligations" of a bailment, not the creation of a bailment by contract. *See id.* (citing *Bank One, Tex., N.A. v. Stewart*, 967 S.W.2d 419, 432 (Tex. App.—Houston [14th Dist.] 1998, pet. denied)).  In any event, RealPage's contract with its clients does not mention any sort of bailment relationship, nor does it appear to contemplate the use of a third-party processor, Stripe. *See* Doc. 77-1, Pl.'s App., 219–20 (authorizing RealPage to act as the clients' agent and process transactions "through a third-party bank").  Thus, the Court cannot find that RealPage contracted to create a bailment under which Stripe would maintain an account holding the client funds.

Overall, with respect to RealPage's bailment argument, RealPage has not established that it was a bailee of the client funds under Texas law. The funds were delivered to Stripe, not RealPage. And RealPage has not demonstrated that it had the right to control Stripe's means of payment processing. Further, even if Stripe were an agent of RealPage under Texas law, the relationship between RealPage, its clients, and its clients' residents does not fall within Texas's definition of a bailment. Finally, RealPage has not established that it contracted to create a bailment.

In sum, funds that are maintained in a commingled account in a third party's name, at a third-party bank, which the insured can direct but not access, are not funds "held" by the insured. The Court recognizes that RealPage might have intended to "hold" the client's funds. Further, the Court acknowledges that the bad actors utilized RealPage credentials to obtain the funds. Nevertheless, the Court's task is to interpret the Policy's language. And here, based on the plain

meaning of "hold," RealPage did not hold the funds. RealPage could have contracted for a broader definition of covered property.[10] But it did not. Accordingly, the Court concludes that the client funds are not covered property under the Policy and **GRANTS** summary judgment in favor of National Union and Beazley on RealPage's declaratory-judgment, breach-of-contract, and anticipatory breach-of-contract claims.[11]

> 2.   Because RealPage did not hold the funds, it did not sustain a direct loss under the Policy.[12]

In addition to demonstrating that its claim involves property covered under the Policy, RealPage must show that it suffered a direct loss. *See* Doc. 77, Pl.'s Mot. App., 22 (specifying that National Union will cover a loss "resulting directly from" Computer Fraud or Funds Transfer Fraud). "Inclusion of the words 'resulting directly from' indicates an intent to limit the coverage available . . . ." *Lynch I*, 962 F. Supp. at 961. This language indicates an intent to limit coverage to losses sustained by RealPage, not third parties. *See id.* at 962.

Here, since RealPage did not hold the funds, its loss resulted from its decision to reimburse its clients. Accordingly, RealPage did not suffer a direct loss as required under the Policy. *See id.* at 964 ("Bartlett's embezzlement did not cause direct out of pocket loss for Lynch; rather, Lynch's loss

---

[10] *See, e.g., First Defiance Fin. Corp. v. Progressive Cas. Ins. Co.*, 688 F.3d 265, 268 (6th Cir. 2012) (*en banc* rehearing denied) (analyzing a "Covered Property" provision that listed property "(1) owned by the insured, (2) held by the insured in any capacity, or (3) owned and held by someone else under circumstances which make the insured responsible for the property prior to the occurrence of the loss" (alterations incorporated)).

[11] Given this holding, the Court need not address whether the Funds Transfer Fraud insuring agreement applies to the facts of this case. *See* Doc. 98, Pl.'s Resp., 24.

[12] Though the Court has already found that RealPage is not entitled to coverage, it nonetheless addresses the issue of direct loss, as it is related to the Court's previous reasoning and extensively briefed by the parties.

arose from its later decision to replace the lost funds."); *see also Tex. Ass'n of Sch. Bds.*, 2016 WL 4257748 at *7 (concluding that the insured did not sustain a direct loss where it did not hold the stolen funds, despite the insured's appointment as an agent to process check payments from the account).

RealPage relies upon two cases to assert that it suffered a direct loss, but the Court finds both distinguishable. First, RealPage's reliance on *BJ Services S.R.L. v. Great American Insurance Company*, 539 F. App'x 545 (5th Cir. 2013) (per curiam), is misplaced. *See* Doc. 76, Pl.'s Mot., 19; Doc. 105, Pl.'s Reply, 16. In *BJ Services*, the insured sought coverage "for losses arising from three sets of dishonest transactions entered into by two employees[.]" 539 F. App'x at 547. In all three sets, the employees acted as representatives for the insured to obtain loans and used the proceeds for personal purposes. *Id.* When the insured attempted to recover the lost funds under an employee-dishonesty policy, the district court granted summary judgment in favor of the insurer, holding that the insured did not suffer a direct loss. *Id.* at 549. The district court declined to examine whether the insured owned or held the stolen assets at issue. *Id.*

On appeal, the Fifth Circuit vacated and remanded the district court's decision in *BJ Services*, reasoning that the insured may have suffered a direct loss. *Id.* at 552. Namely, "if [the employees] acted with apparent authority in receiving the assets from the lenders, [the insured] received the assets," and the insured thus suffered a direct loss. *Id.* Citing agency law, the Fifth Circuit explained that "an apparent agent, acting with only apparent authority, can receive property on behalf of the principal." *Id.* at 551. So if the employees in *BJ Services* "had apparent authority to enter the transactions on behalf of [the insured], they created binding contracts between [the insured] and the lenders." *Id.* In turn, then, the insured would have received the loaned funds when the insured's

employees accepted them. *Id.* Put differently, the Fifth Circuit reasoned that the district court must examine whether, by way of agency principles, the funds were the property of the insured. *See id.* If so, the insured sustained a direct loss. *Id.* at 552.

Here, unlike in *BJ Services*, there is no dispute as to whether, by way of agency law, the stolen funds were the property of RealPage. RealPage accurately states that in *BJ Services*, the Fifth Circuit reasoned "that if the employees received the assets on behalf of the insured, . . . then the employees took the assets from the insured[.]" Doc. 76, Pl.'s Mot., 19. But RealPage omits the basis for this holding: the possibility that the employees, based on agency principles, had apparent authority to enter "binding contracts between [the insured] and the lenders." *BJ Services*, 539 F. App'x at 551. Thus, contrary to RealPage's arguments, *see* Doc. 76, Pl.'s Mot., 19, the Fifth Circuit did not broadly hold that when one entity acts on behalf of another, any loss to the former is a direct loss to the latter. Rather, it recognized the possibility that an insured may suffer a direct loss of funds where the insured received those funds through contracts entered by employees acting with apparent authority.[13]

Likewise, the facts at issue in *Cedar Lake* are distinguishable from those at issue here. *See* Doc. 76, Pl.'s Mot., 20; Doc. 105, Pl.'s Reply, 14 (citing 2015 WL 9690846). In *Cedar Lake*, the stolen funds were "in accounts on which [the insured] was the custodian"; the insured was "the sole account holder" on the accounts; and the insured "had exclusive authority to sign checks from the accounts." *Id.* at *4. Under these circumstances, the District of Oregon concluded the insured held

---

[13] In its reply, RealPage also appears to argue that just as the bad actors in *BJ Services* could act with apparent authority on behalf of the insured, RealPage acted with actual authority on behalf of its clients. *See* Doc. 105, Pl.'s Reply, 16 n.21. But this analogy fails to account for Stripe's role in the transactions—the crux of this dispute.

the funds at issue and thus suffered a direct loss. *Id.* at *5.

In contrast, RealPage was not the custodian or account holder of Stripe's account, nor did it possess check-writing authority over the account. Thus, regardless of the weight this Court may accord a District of Oregon opinion, it is wholly distinguishable.

Overall, because RealPage did not hold the client funds, it did not sustain a direct loss when the funds were stolen.[14]

B.    *The Court Grants Summary Judgment in Favor of National Union on RealPage's Remaining Claims.*

Lastly, the Court must address RealPage's remaining claims against National Union: claims under Chapters 541 and 542 of the Texas Insurance Code. RealPage alleges National Union violated § 541.060(a)(2) "by failing to attempt in good faith to effectuate a prompt, fair[,] and equitable settlement . . . once liability had become reasonably clear." Doc. 1, Compl., ¶ 76. Such a claim fails where the insurer "had a reasonable basis for denying" the claim. *Laws. Title Ins. Corp. v. Doubletree Partners, L.P.*, 739 F.3d 848, 870 (5th Cir. 2014). Here, given the Court's holding that RealPage is not entitled to coverage for its claim, National Union had a reasonable basis for denying coverage. Accordingly, the Court **GRANTS** summary judgment on RealPage's § 541.060(a)(2) claim in favor of National Union.

RealPage also asserts violations of §§ 542.056 and 542.058(a), statutory provisions within the PPCA. But like RealPage's Chapter 541 claim, these claims fail due to the Court's holding that

---

[14] Additionally, because RealPage did not suffer a direct loss, the Policy's indirect-loss exclusion, which bars coverage for "[l]oss that is an indirect result of an 'occurrence' covered by" the Policy, Doc. 77, Pl.'s Mot., App., 23, also precludes RealPage's claim for coverage. *See Lynch I*, 962 F. Supp. at 964 (concluding that where the insured did not suffer a "direct out of pocket loss," the exclusion for "[l]oss that is indirect result of any act or 'occurrence'" applied).

- 26 -

RealPage is not entitled to coverage. *See State Farm Lloyds v. Page*, 315 S.W.3d 525, 532 (Tex. 2010) ("When the issue of coverage is resolved in the insurer's favor, extra-contractual claims do not survive." (citation omitted)); *Barbara Techs. Corp. v. State Farm Lloyds*, 589 S.W.3d 806, 813 (Tex. 2019) ("If the insured fails to establish either that the insurer is liable for the claim or that the insurer failed to comply with a provision of the [PPCA], the insured is not entitled to [PPCA] damages."). Consequently, the Court **GRANTS** summary judgment in favor of National Union on RealPage's Chapter 542 claims, too.

## IV.

## CONCLUSION

For the reasons explained above, RealPage has not met its burden of demonstrating coverage under the Policy. Thus, the Court **DENIES** RealPage's summary-judgment motion (Doc. 75) and **GRANTS** National Union's and Beazley's summary-judgment motions (Docs. 80 & 72, respectively). Additionally, because this Order disposes of all claims asserted by RealPage, the Court **DENIES** National Union's pending motions to exclude expert testimony (Docs. 106 & 109) as **MOOT**.


SO ORDERED.

SIGNED: February 24, 2021.


_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE

- 27 -